United States District Court
Southern District of Texas
**ENTERED**
February 22, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| v. | § | CRIMINAL ACTION NO. 4:22-cr-092 |
| JOSHUA LEON BEARD | § § § § § | |

## ORDER

Pending before the Court is defendant Joshua Leon Beard's ("Defendant" or "Beard") Motion to Suppress (Doc. No. 23). The United States of America ("Government") responded in opposition to the motion (Doc. No. 39). This Court held a hearing and took testimony on the Motion. After reviewing the Motion, the testimony, the arguments, and the applicable law, the Court hereby **DENIES** the Motion to Suppress.

### I. Background

On December 22, 2021, law enforcement officers conducted an investigation into Beard and discovered that he had an outstanding warrant for manufacture or delivery of a controlled substance based on Beard's previous arrest in November 2020. (Doc. No. 39 at 3). The officers also received information that Beard was connected to a recent shooting of a rival gang member and that his ankle monitor had stopped working. (*Id.* at 4). The ankle monitor's last registered location was a trailer park at 830 22nd Street, San Leon, Texas. (*Id.*). Law enforcement officers conducted surveillance at the trailer park and saw Beard enter Trailer 19. (*Id.*). The officers also saw Beard leave the trailer with a woman, who was later identified as Jonelle Wiley ("Wiley"), go to a nearby Dollar General store, and return to the trailer. (*Id.*).

Seven law enforcement officers surrounded Trailer 19. The officers knocked on the trailer door, announced that they were the police and had an arrest warrant, and demanded that Beard open the door. (*Id.*). No one answered the door, which was locked, but officers heard foot movements inside. (*Id.*). The officers used a breaching device, which successfully opened the door. (*Id.* at 5). Beard was in the bathroom and Wiley was in the bunk area with her hands up. (*Id.*). Drug paraphernalia was allegedly in plain view in the kitchen near the entrance area of the trailer. (*Id.*). Beard crawled on his stomach to the door of the trailer and was dragged outside. (*Id.*). He was not cooperative with the officers and was eventually tased and then handcuffed. (*Id.*). The officers also removed Wiley from the trailer and handcuffed her. (*Id.*).

Once Beard and Wiley were both handcuffed, an initial safety sweep was conducted using a K-9 unit. (*Id.*). Officer Stefan Fasolino ("Fasolino"), the K-9 unit's handler, asked Beard whether any other individuals were inside the trailer. (*Id.*). Beard replied that no one else was inside. (*Id.*). Officer Fasolino approached the trailer and shouted, "If there's anyone else in here, make yourself known." When there was no response, Officer Fasolino released the K-9 unit into the trailer to search for additional individuals. (*Id.*). The K-9 unit completed his search in approximately 22 seconds and did not alert the officers of additional people inside.

The officers then conducted a second safety sweep of the trailer themselves. (*Id.* at 6). The officers did not have a search warrant and did not attempt to obtain one prior to conducting this search. During the sweep, Officer C.D. Murphy ("Murphy") allegedly observed drugs on the bathroom floor and a gun in a bathroom cabinet whose door was ajar. (*Id.*). The officers' sweep took less than two and a half minutes. (*Id.*). Officer Murphy returned later to photograph the items.

In the instant case, Beard is charged with possessing a firearm after being previously convicted of a felony. (Doc. No. 1). Beard subsequently filed a motion to suppress the firearm

2

based upon the officers' warrantless entry into the trailer. (Doc. No. 23). Specifically, he raises three arguments: (1) the firearm was not in plain view when Beard was arrested at the trailer door; (2) the officers' protective sweep was unjustified because the K-9 unit had already conducted an initial protective sweep; and (3) there was no consent to search the trailer. (Doc. No. 23 at 1).[1] The Government responded in opposition (Doc. No. 39). Testimony and evidence were provided to this Court during a hearing on the matter (Minute Entry from 2/13/2023).

## II. Analysis

In his Motion, Beard argues that the firearm seized from his trailer should be suppressed because it was the product of an improper search and seizure in violation of the Fourth Amendment. Following a hearing on the Motion, the central questions before this Court are: (1) whether the officers' protective sweep was justified and (2) whether the firearm was in plain view. The parties do not contest that Beard did not consent to the search.

### A. Was the Officers' Protective Sweep Justified?

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Under the Fourth Amendment, warrantless entry into a home is presumptively unreasonable unless it falls under a narrowly defined exception. *United States v. Howard*, 106 F.3 70,73 (5th Cir. 2017). When an individual is subjected to a warrantless search, the government has the burden of proving that the search was justified. *United States v. Garcia-Lopez*, 809 F.3d 834, 838 (5th Cir. 2016).

A "protective sweep" is an exception to the Fourth amendment's warrant requirement. *Maryland v. Buie*, 494 U.S. 325, 326-27, 337 (1990). A protective sweep entails a brief, limited

---

[1] The Government does not claim that Beard consented, nor has it offered any proof in that regard. That being the case, this Court finds he did not consent to the search. It need not address that issue further.

3

search of the premises, typically conducted incident to an arrest and for the purpose of protecting the safety of police officers or others. *Id.* at 327. Such a sweep is only justified when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334, 110 S.Ct. 1093. When determining whether a protective sweep is justified, this Court must consider the totality of the circumstances surrounding the officers' actions. *Howard*, 106 F.3d at 74. The four factors courts generally consider are whether: (1) the government agents have a legitimate law enforcement purpose for being in the house; (2) the sweep is supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene; (3) the sweep is no more than a cursory inspection of those spaces where a person may be found; and (4) the sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and lasts no longer than the police are justified in remaining on the premises. *See United States v. Mendez*, 431 F.3d 420, 428 (5th Cir. 2005); *United States v. Roberts*, 612 F.3d 306, 311 (5th Cir. 2010). The Fifth Circuit has also held that "[i]f reasonable minds could differ on whether the sweep was warranted, we do not second-guess the judgment of experienced law enforcement officers concerning the risks in a particular situation." *United States v. Silva*, 865 F.3d 238, 242 (5th Cir. 2017) (citing *United States v. Menchaca-Castruita*, 587 F.3d 283, 290 (5th Cir. 2009).

Beard argues that the protective sweep was not justified because the K-9 unit provided a sufficient cursory inspection that should have dispelled any reasonable suspicion of danger. (Doc. No. 23 at 9). This Court disagrees. As an initial matter, Beard offers no legal authority to support his argument that an initial sweep conducted by a K-9 unit precludes a subsequent safety sweep

by officers. Furthermore, the evidence presented before this Court demonstrated that the officers' protective sweep was justified.

First, the officers had a legitimate law enforcement purpose for being inside the trailer. As an initial matter, the officers were executing an outstanding warrant for felony manufacture or delivery of drugs. Beard had failed to comply with his court ordered ankle monitor, which was a condition of his release on bond. He was also known to be affiliated with a gang and was a suspect in a recent gang related shooting. Further, during the suppression hearing, Officer Fasolino, the K-9 unit's handler, testified that it is standard operating procedure to conduct a second sweep with officers even after a K-9 unit completes an initial search for additional safety. Officer Fasolino also testified that despite extensive training, K-9 units may still make "mistakes" or end up in "unwinnable" search scenarios where they miss hidden individuals in some spaces. In particular, Officer Fasolino described a training exercise where multiple dogs missed an individual hiding in an attic space because of the way the breeze entered the area being searched and blew the human scent away from where the individual was hiding. No dog was able to locate the hiding individual, thus making the search "unwinnable." Furthermore, since dogs are unable to open doors or cabinets, multiple officers testified that there remained a possibility that an individual was hiding in an enclosed space in the trailer that the dog had missed even after it had conducted its initial search and found no one. Thus, the Court finds that there was a legitimate law enforcement purpose for being in the trailer.

Second, the Court finds that the sweep conducted by the officers was supported by a reasonable, articulable suspicion that the trailer may have harbored additional dangerous individuals, even after Beard and Wiley were removed. The purpose of a protective sweep is ultimately to "protect the safety of police officers or others." *Silva*, 865 F.3d at 241. Multiple

officers testified that they conducted the second sweep because they were concerned for their safety and could not be certain that no one else was inside the trailer. As discussed previously, Officer Fasolino's testimony affirmed that although following a K-9 unit's protective sweep a space may be less likely to harbor a hiding individual, it was not outside the realm of possibility. Officer Fasolino also testified that a second sweep by officers is always done for additional safety as a standard operating procedure. Officers also testified that they heard more than one set of footsteps inside the trailer when Beard failed to comply with their knock-and-announce. Moreover, the officers testified that they had knowledge of Beard's criminal history, which included multiple offenses involving guns, drugs, and evading arrest, and his affiliation with a gang and potential involvement with a recent shooting of a rival gang member. Based on the evidence and the testimony offered during the hearing, it is clear that the officers had a reasonable, articulable reason to be concerned about their safety, and consequently, to conduct a second sweep.

The final two factors also weigh in the Government's favor. As an initial matter, the officers were only in the trailer for approximately two and a half minutes during their search, so the sweep was not longer than what was necessary to clear the premises. Separately, Beard argues—with some justification—that the officers searched in areas of the trailer that appear unlikely to harbor an adult human in hiding and that the sweep exceeded a mere "cursory inspection of those spaces where a person may be found." The Government argues that based on body camera footage and testimony from the officers, the search was by the book and only involved opening closet doors, cabinets, and tight spaces such as drawers to check if individuals could be hidden in these spaces. Evidence presented during the suppression hearing, however, did establish that officers also searched the freezer of the refrigerator unit in the trailer and had removed the lid to the toilet tank in the bathroom. While multiple officers testified that humans

are capable of hiding in small spaces—and indeed, this Court has seen human smuggling cases where individuals have been found in a number of spaces not designed or expected to hold humans—spaces such as a trailer's freezer or the toilet tank strains credulity as likely places officers could find a hiding person. Nonetheless, when considering the totality of the circumstances surrounding the officers' actions in regard to the protective sweep, these discrepancies are not enough to invalidate the officers' protective sweep. This is especially true since the gun in question was not found by opening an unreasonably small space.

The present case also bears a strong resemblance to the Fifth Circuit's decision in *United States v. Silva*. 865 F.3d 238 at 240. The Fifth Circuit held that the protective sweep law enforcement officers conducted of Silva's trailer during their execution of an outstanding arrest warrant was justified after considering that: (1) law enforcement was familiar with Silva's "extensive" criminal history and gang affiliation; (2) officers had received information prior to the arrest that there was a possibility a weapon could be in the trailer; (3) Silva took over a minute to exit the trailer after law enforcement announced their presence; (4) law enforcement testified that even though they had no indication of additional individuals in Silva's trailer, the trailer still posed a potential safety risk; and (5) law enforcement testified that they conducted the sweep because they were concerned for their safety, particularly that they could not confirm with certainty that no one else was in the trailer. *Id.* at 242.

Here, the officers similarly testified that (1) were familiar with Beard's criminal history, which involved guns and drugs, and gang affiliation; (2) had knowledge from social media posts that Beard, despite his felony conviction, was potentially in possession of a Glock firearm; (3) knocked and announced and Beard did not immediately open the trailer door, which had to be breached; (4) officers testified that even though they only saw Beard and Wiley enter and exit the

7

trailer, they could not be certain no one else was inside as they had heard multiple sets of footsteps inside before breaching the door; and (5) conducted the second protective sweep despite the initial sweep by the K-9 unit because they were concerned for their safety, it was standard operating procedure to conduct a second sweep with officers even after the use of a K-9 unit, and the possibility that a K-9 could not detect individuals hiding in tight spaces in the trailer.

Given the testimony presented at the suppression hearing and viewing the evidence in the light most favorable to the Government, this Court is convinced that there were "articulable facts, which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Thus, this Court finds that the second protective sweep conducted by officers was justified and did not violate Beard's Fourth Amendment rights.

### B. Was the Firearm in Plain View During the Officers' Protective Sweep?

"[E]vidence or contraband seen in plain view during a lawful sweep can be seized and used in evidence at trial." *United States v. Garcia-Lopez*, 809 F.3d 834, 839 (5th Cir. 2016) (citing *United States v. Jackson*, 596 F.3d 236, 242 (5th Cir. 2010)). "While the Fourth Amendment generally prohibits seizures, the 'plain view' exception allows police to seize items where: (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was 'immediately apparent;' and (4) the police had a lawful right of access to the item." *United States v. De Jesus-Batres*, 410 F.3d 154, 159 (5th Cir. 2005).

Since this Court has found that the officers' sweep was justified, the remainder of the parties' dispute is whether the firearm was in plain view during the human protective sweep. According to Officer Murphy's testimony, when conducting the protective sweep, he was first to

8

enter the bathroom, where he saw the firearm in plain view in the cabinet under the sink because the cabinet door was open when he entered the bathroom.

Based Officer Murphy's testimony, there is uncontroverted evidence that the firearm was in plain view during the officers' protective sweep. Although, as previously discussed, Beard argues that the officers' search exceeded the scope of a protective sweep when officers searched the trailer's freezer and toilet tank, this does not change the fact that there is uncontroverted evidence from Officer Murphy that the firearm was in plain view in the cabinet under the sink. Had the firearm been found in a space such as the freezer or toilet tank, rather than an open cabinet in plain view, this Court may have come to a different conclusion. Thus, based on the testimony presented, this Court finds that the gun was in plain view during an authorized protective sweep and was seized in accordance with the Fourth Amendment.

### III. Conclusion

For the foregoing reasons, the Court **DENIES** Beard's Motion to Suppress (Doc. No. 23).

Signed at Houston, Texas, this 22nd day of February, 2023.

Andrew S. Hanen
United States District Judge